IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

RICHARD WELSH,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

        Defendant.

No. C12-0102

RULING ON JUDICIAL REVIEW

---

**TABLE OF CONTENTS**

*I.*   *INTRODUCTION* .................................... 2

*II.*   *PRIOR PROCEEDINGS* ............................ 2

*III.*  *PRINCIPLES OF REVIEW* ........................ 5

*IV.*  *FACTS* .......................................... 7
    *A.*   *Welsh's Education and Employment Background* ............. 7
    *B.*   *Administrative Hearing Held on March 11, 2009* ............... 8
        *1.*   *Welsh's Testimony* ............................ 8
        *2.*   *Vocational Expert's Testimony* ................... 9
    *C.*   *Administrative Hearing Held on February 22, 2012* ........... 10
        *1.*   *Welsh's Testimony* ............................ 10
        *2.*   *Vocational Expert's Testimony* .................. 12
    *D.*   *Welsh's Medical History* ......................... 14

*V.*   *CONCLUSIONS OF LAW* ......................... 21
    *A.*   *ALJ's Disability Determination* ..................... 21

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

      **B.**    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . . 24
              *1.*    *RFC Assessment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              *2.*    *Vocational Expert Testimony, the DOT, and Significant Jobs*
                  *in the National Economy* . . . . . . . . . . . . . . . . . . . . . . . 27

**VI.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**VII.**  **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Richard Welsh on October 16, 2012, requesting judicial review of the Social Security Commissioner's decision to deny his multiple applications for Title II disability insurance benefits (2006 and 2010) and application for Title XVI supplemental security income ("SSI") benefits (2010). Welsh asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide both disability insurance benefits and SSI benefits.[2] In the alternative, Welsh requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

Welsh first applied for disability insurance benefits on November 27, 2006. In his application, Welsh alleged an inability to work since August 12, 2006 due to shoulder and hand problems. Welsh's application was denied on April 27, 2007. On October 3, 2007, his application was denied on reconsideration. On November 7, 2007, Welsh requested an administrative hearing before an Administrative Law Judge ("ALJ"). On March 11, 2009, Welsh appeared via video conference with his attorney before ALJ Marilyn P.

---

[2] Welsh was awarded SSI benefits beginning on April 27, 2012. Therefore, any award of disability insurance benefits or SSI benefits on appeal would be for the time period prior to April 27, 2012.

Hamilton for an administrative hearing.[3]  Welsh and vocational expert Carma Mitchell testified at the hearing.  In a decision dated May 7, 2009, the ALJ denied Welsh's claim. The ALJ determined that Welsh was not disabled and not entitled to disability insurance benefits because he was functionally capable of performing other work that exists in significant numbers in the national economy.  Welsh appealed the ALJ's decision.  On July 19, 2010, the Appeals Council denied Welsh's request for review.  Consequently, the ALJ's May 7, 2009 decision was adopted as the Commissioner's final decision.

On September 20, 2010, Welsh filed an action for judicial review in the Northern District of Iowa.  *See* case number 1:10-cv-0120-JSS.  The Commissioner filed an Answer on November 29, 2010.  On July 27, 2011, the Court entered a ruling reversing and remanding the action for further proceedings, requiring the ALJ to resolve all conflicts between the vocational expert's testimony, the DOT job descriptions, and Welsh's RFC in making the disability determination.  *See* docket number 17, in case number 1:10-cv-0120-JSS.

On August 13, 2010, while his request for review on the 2006 disability insurance benefits application was pending before the Appeals Council, and prior to initiating judicial review of that case in federal court, Welsh filed new applications for both disability insurance benefits and SSI benefits.  Both applications were denied on October 14, 2010. On December 8, 2010, both applications were denied on reconsideration.  On January 18, 2011, Welsh requested an administrative hearing before an ALJ.  On January 13, 2012, the Appeals Council directed an ALJ to issue a decision on both Welsh's 2006 application for disability insurance benefits as ordered by the Court on remand, and Welsh's 2010

---

[3]  At the time of the hearing, Welsh was represented by attorney Kenneth F. Dolezal.  On appeal, he is represented by attorney Mary Hoefer.

applications for disability insurance benefits and SSI benefits, filed prior to the Court's order on remand.[4]

On February 22, 2012, Welsh appeared with his attorney before ALJ Eric S. Basse for an administrative hearing. Welsh and vocational expert Marion Jacobs testified at the hearing. The administrative hearing was continued to a later date for completion of the examination of vocational expert Marion Jacobs. On May 25, 2012, Welsh again appeared with his attorney before ALJ Basse, and testified at the hearing, along with Jacobs. In a decision dated July 13, 2012, the ALJ determined that prior to April 27, 2012, Welsh was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing other work that exists in significant numbers in the national economy. However, beginning on April 27, 2012, the ALJ determined that Welsh was disabled and entitled to SSI benefits by direct application of Medical-Vocational Rule 201.14.[5] Because the Appeals Council did not review the remand decision on its own

---

[4] It is unclear from the record as to the reason for the nearly year long delay between Welsh's request for an administrative hearing on his 2010 applications, and the Appeals Council's order for an ALJ to hold a hearing on those claims and the issues from Welsh's 2006 application on remand.

[5] In order to meet the requirements for disability insurance benefits under Title II, a claimant must establish that he or she was disabled prior to the date his or her insured status expired. *See* 20 C.F.R. § 404.130. Welsh's insured status expired on December 31, 2009. *See* Administrative Record at 864. Accordingly, in order to be eligible for disability insurance benefits, the ALJ needed to find Welsh to be disabled on or before December 31, 2009. Eligibility for SSI benefits under Title XVI, requires a claimant to establish that he or she was disabled while his or her application was pending. *See* 20 C.F.R. § 416.330. Here, the ALJ determined that on April 27, 2012, the date Welsh turned 50 years old, Welsh was disabled "by direct application of Medical-Vocational Rule 201.14." Administrative Record at 863. Medical-Vocational Rule 201.14 provides that an individual "closely approaching advanced age," 50-54, with a sedentary residual functional capacity ("RFC") and no transferable skills, is considered disabled. The ALJ determined that prior to turning 50, and based on his RFC, Welsh was functionally capable
(continued...)

motion, and Welsh did not file a special exception for review of the remand decision with the Appeals Council, the ALJ's July 13, 2012 was adopted as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.984; 416.1484 (explaining Appeals Council review of an ALJ's decision in a case remanded by a federal court). *See also* Administrative Record at 847 (In the notice provided to Welsh from the Social Security Administration regarding the ALJ's decision, Welsh was instructed that "[i]f you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice. After my decision becomes final, you will have 60 days to file a new civil action in Federal district court.").

On October 16, 2012, Welsh filed this action for judicial review. The Commissioner filed an answer on December 13, 2012. On January 14, 2013, Welsh filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that he was not disabled and that there was other work that existed in significant numbers in the national economy that he could perform prior to April 27, 2012, the date he turned 50 years old. On March 15, 2013, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On March 25, 2013, Welsh filed a reply brief. On December 28, 2012, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3),

---

[5](...continued)
of performing other work that exists in significant numbers in the national economy; and therefore, Welsh was found to be not disabled. *See* Administrative Record at 862.

the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice

6

within which the [Commissioner] may decide to grant or deny
benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Welsh's Education and Employment Background

Welsh was born in 1962. He completed the eleventh grade in high school. At the hearing, Welsh testified that while in school, he was not required to take any special education courses. Later, Welsh earned a GED and an associate's degree in nursing.

The record contains a detailed earnings report for Welsh. The report covers Welsh's employment history from 1978 to 2011. From 1978 and 1992, Welsh earned between $654.93 (1983) and $14,723.96 (1991). He had no earnings from 1993 to 1995.

7

From 1996 to 2004, Welsh earned between $175.50 (1996) and $15,782.53 (2000). He earned $13,655.50 in 2004, his last year of reported earnings.

### B. Administrative Hearing Held on March 11, 2009

### 1. Welsh's Testimony

At the time of the administrative hearing, the ALJ inquired of Welsh why he believed he was no longer able to work. Welsh explained that:

> Well my, well with my shoulders, my tendons are, especially on my left hand side, I've actually had five surgeries and they have been where tendons have either had total tears or partial tears. And my tendons have been stretched out. In fact it was cut down at one point and reattached and they spent six months trying to re-lengthen it. I can't, my tendon tears even while I was in physical therapy in one week. It's torn out of physical therapy just on its own if I move too fast, if I hold it or trying to lift something away from my body my tendon's going to tear. My right hand, I can't use my right hand very well. I've adapted to a few things but I have problems turning on faucets, washing dishes.

(Administrative Record at 57.) Welsh further stated that he can "hardly" do "anything" with his right hand because he doesn't have the strength to "hold on to stuff."[6] Welsh also described significant pain in his right arm and hand due to "uncontrolled nerve impulses."

Welsh was also asked to describe his difficulties with anxiety:

> Like right now I'm kind of real shaky like. I haven't, I haven't been able to go, I haven't been out in public much. I started, I don't know why, I used to go anywhere at any time and I don't go out in public very much anymore. . . . But as far as going to the store and places like that, I'm not able, I don't know why. I can't get myself to go to like Wal-Mart of [sic] Hy-Vee. . . . I just don't go out, I don't know why.

---

[6] Administrative Record at 58.

(Administrative Record at 64.) Welsh further explained that he has difficulty sleeping at night due to pain, but also has difficulty sleeping during the day because of his anxiety. Consequently, Welsh maintains that he is constantly tired throughout the day.

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who:

> can do light work[.] . . . [T]he person can only occasionally climb ropes, ladders, scaffolds; occasionally kneel, crouch, crawl; can frequently climb ramps or stairs, frequently balance and stoop; the person should avoid concentrated exposure to extreme cold, to vibrations and to hazards such as moving machinery and unguarded heights. There are manipulative limitations as follows; with the upper extremity the person would only do rare overhead reaching; the person, by the way, is left hand dominant. With the right upper extremity the person should only have rare overhead reaching but has a limitations in handling, fingering and feeling to occasional to rare, so less than occasional I suppose for that. . . . There should be no driving as a requirement of the job, the person is able to do only simple, routine, repetitive work with only simple, work related decisions and few work place changes.

(Administrative Record at 78-79.) The vocational expert testified that under such limitations, Welsh could not perform his past relevant work. The vocational expert further testified that Welsh could perform the following work: (1) usher (240 positions in Iowa and 35,200 positions in the nation), (2) information clerk (800 positions in Iowa and 90,200 positions in the nation), (3) shipping weigher (460 positions in Iowa and 29,900 positions in the nation), and (4) conveyor tender (230 positions in Iowa and 12,000 positions in the nation).

The ALJ provided the vocational expert with a second hypothetical for an individual who:

9

can do sedentary work . . . but [] is actually even more restricted in lifting, can only occasionally and frequently lift up to five pounds or less. The person should never climb ropes, ladders, scaffolds; only occasionally climb ramps, stairs; occasionally balance, stoop, kneel, crouch and crawl. The person should do no lifting bilaterally above the shoulder, no reaching bilaterally above the shoulder. The person is left hand dominant and has right hand upper extremity limitations in handling, fingering, feeling to occasionally to rare. Should be no driving as a requirement of the job. The person should avoid concentrated exposure to extreme cold, to vibrations, to hazards such as moving machinery and unguarded heights. The person is able to do only simple, routine, repetitive work with simple work related decisions and few work place changes.

(Administrative Record at 80.) The vocational expert testified that under such limitations, Welsh could not perform his past relevant work. The vocational expert further testified that Welsh could perform the following work: (1) surveillance systems monitor (200 positions in Iowa and 33,000 positions in the nation), (2) call-out operator (130 positions in Iowa and 11,100 positions in the nation), and (3) unskilled order clerk (200 positions in Iowa and 17,000 positions in the nation).

### C. Administrative Hearing Held on February 22, 2012[7]

### 1.    Welsh's Testimony

At the administrative hearing, the ALJ asked Welsh about his difficulties with using his right arm and hand. Welsh explained that "I can move it. I can hold very light objects. It's hard -- I can't feel it. . . . It's numb. I can't feel the arm. But there's no

---

[7] The administrative hearing held on February 22, 2012, was continued to May 25, 2012, in order to allow Welsh's attorney and the ALJ to further question the vocational expert. The Court will not separately address the May 25 hearing. Any facts or testimony from the May 25 hearing pertinent to this case will be discussed, as necessary, in the Court's consideration of the legal issues presented.

strength to the -- to being able to pick stuff up and/or sustain, you know, grip or anything."[8] The ALJ further questioned Welsh about his abilities with his arms:

> Q: Okay. So since your surgeries then back in '08, it's been pretty much the way it's been. You can reach overhead a little bit, you can maybe lift a gallon of milk from time-to-time. Is that about right?
>
> A: That's about the limit of it, yes.
>
> Q: And you keep your arm kind of propped?
>
> A: Yes, sir.

(Administrative Record at 916.) Next, the ALJ inquired about Welsh's foot difficulties:

> Q: . . . Are you continuing to have any pain with your left foot now?
>
> A: Yes, I do.
>
> Q: Tell me about that?
>
> A: They resected the toe and then they cut off some and then they reattached it and it doesn't set right and I have pain when I walk from when I bend my toe. It just isn't the same and I just have a sharp pain when I walk. I can tolerate it but it is very painful.
>
> Q: Okay. Do you do anything special to treat that?
>
> A: There's nothing that I can do. I've got pads in my shoes is about all I can do. But it's in the bending motion that's interfering.
>
> Q: Well how long can you stand and walk at any one time?
>
> A: Oh maybe 20 minutes to 45 minutes depending. If I can't just stand still it -- I -- it starts to hurt.
>
> Q: Okay.
>
> A: As far as walk, I don't know, maybe up to about a block, block and-a-half.
>
> Q: There's something in the record, I think, that you were using a cane? Do you use a cane now?
>
> A: I use it when I don't know how long I'm going to have to be up and moving around or how far. Like today, I didn't know where this was. Distance wise, if I don't

---

[8] Administrative Record at 909.

know, I will take a cane just in case when it starts to get
inflamed in my legs, in my knees and hips.

(Administrative Record at 916-17.) Welsh also testified that it would be difficult for him
to sit for an entire eight-hour workday. He stated that he would need to get up and move
around periodically.

The ALJ and Welsh also discussed Welsh's part-time job at a bar. Welsh explained
that he worked 5 to 10 hours per week at a bar checking patron identification cards on
Friday and Saturday nights. Welsh testified that while working at the bar, "I stand for
short periods of time. They have a taller chair where I can drape one leg. I can walk
around a little bit just as long as I keep an eye on the door. Stretch a little bit with my legs
and take a little walk. I don't have to set in one specific way or period of time or
anything. I alternate quite often."[9] Welsh stated that he could not do that type of work
eight hours per day or 40 hours per week because it would cause him too much pain.

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Marion Jacobs with a
hypothetical for an individual who is:

> capable of performing light work . . . who can occasionally
> push, pull with the bilateral upper extremities; who can
> occasionally climb, balance, stoop, kneel and crouch but
> cannot crawl or climb ladders, ropes and scaffolds. He should
> have no overhead reaching with the bilateral upper extremities
> and with his right upper extremity he can perform rare -- or
> strike that. With his right upper extremity he cannot perform
> grasping and fingering. He is left hand dominate and he
> should perform only simple work-related decisions with few
> work place changes.

(Administrative Record at 934-35.) The vocational expert testified that under such
limitations, Welsh could not perform his past relevant work. The vocational expert further

---

[9] Administrative Record at 920.

12

determined that Welsh could perform the following work: (1) usher (240 positions in Iowa and 35,000 positions in the nation), and (2) shipping weigher (460 positions in Iowa and 30,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical for an individual:

> who is capable of performing sedentary work . . . can lift up to five pounds with either of the upper extremity; who cannot climb ropes, ladders or scaffolds; who can occasionally climb ramps and stairs; who can occasionally balance, stoop, kneel, crouch and crawl; who cannot perform lifting or reaching above the shoulders bilaterally. He is left-hand dominate and is limited to occasionally or less handling and fingering with his right hand. There should be no requirement to drive on the job. He must avoid concentrated exposure to cold, vibrations and hazards such as moving machinery and heights. Assume he can perform simple routine repetitive work with simple work-related decisions and few work place changes.

(Administrative Record at 936.) Again, the vocational expert testified that under such limitations, Welsh could not perform his past relevant work, but could perform the following work: (1) surveillance system monitor (200 positions in Iowa and 25,000 positions in the nation), and (2) call-out operator (130 positions in Iowa and 11,000 positions in the nation).

Welsh's attorney also questioned the vocational expert. Welsh's attorney inquired:

> Q: If we were to take the [ALJ's] first hypothetical but add the restriction that he will miss work more than twice a month because of medical appointments or ongoing pain and fatigue, would that eliminate all those jobs actually, not just those in the first hypothetical but this in the other hypotheticals?
> A: Yes.
> Q: What if he needs to alternate positions every 20 to 30 minutes between sitting and standing and walking about? Would that also eliminate the jobs you identified in response to all these questions?

13

| A: | I think the surveillance system monitor would still be viable. |
|---|---|
| Q: | Even if he needed to leave the work station to walk about? |
| A: | Yes. . . . He's simply watching TV screens in a public or private facility. |
| Q: | He would -- what if he works at a slow pace for up to a third of the day due to pain and fatigue? |
| A: | I think that would take him out of competitive employment, in my opinion. |

(Administrative Record at 943.)

### D. Welsh's Medical History

On August 12, 2006, Welsh was involved in a serious motorcycle accident. He was hospitalized for three weeks. While in the hospital, he was treated for extensive abrasions, lacerations, fractured ribs, and a fractured clavicle. Welsh was discharged on September 1, 2006, and continued to be treated with physical and occupational therapy.

On September 14, 2006, Welsh met with Dr. Mark Young, M.D., regarding weakness and paresthesias in his right hand and arm in connection with his motorcycle accident. Upon examination, Dr. Young diagnosed severe right brachial plexopathy. Dr. Young opined that Welsh should have improvement of neurologic function over time, and recommended continued physical therapy and conservative care.

On March 2, 2007, at the request of Disability Determination Services ("DDS"), Welsh met with Michele McNeal, Ed.S. and Joan Jacob, M.A., for a mental status examination. McNeal and Jacob noted that Welsh was diagnosed with anxiety disorder in approximately 1997. McNeal and Jacob further noted that he "has tried a variety of medications with limited success."[10] McNeal and Jacob described Welsh's activities of daily living as follows:

---

[10] Administrative Record at 366.

Currently, [Welsh] struggles completing any task that requires minimal stamina or exertion. He used to enjoy cooking and grilling out, but now struggles 'cutting a pizza slice.' He showers only a few times per week as taking a shower is stressful and exhausting. Getting dressed is difficult as [Welsh] can only use his left arm. . . . [Welsh] understands the purpose of his medications. He is able to estimate prices and count change. He lost his driver's license after his motorcycle accident. [Welsh] is becoming familiar with a computer and internet functions. He must type slowly using only 1 hand.

(Administrative Record at 368.) Upon examination, McNeal and Jacob opined that Welsh had the ability to:

remember and understand simple and complex instructions, procedures and locations. Without significant improvement with his shoulder, arm and hand pain, and body strength, he will be unable to carry out tasks requiring a minimal degree of physical exertion of his upper body. It is probable [Welsh] will be unable to maintain the pace expected at most competitive jobs. When he is experiencing pain, his concentration and attention to task is negatively impacted. When not in a high degree of pain, he does seem to have the skills necessary to exercise independent judgment within the workplace. He reports a history of positive relationships with supervisors and coworkers and presented positive social skills throughout [his] interview.

(Administrative Record at 369-70.) McNeal and Jacob diagnosed Welsh with major depressive disorder, generalized anxiety disorder, and history of polysubstance abuse. McNeal and Jacob assessed Welsh with a GAF score of 50.

On March 21, 2007, Dr. David A. Christiansen, Ph.D., reviewed Welsh's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Welsh. On the Psychiatric Review Technique assessment, Dr. Christiansen determined that Welsh had the following limitations: no restriction of activities of daily living, no difficulties in maintaining social functioning, and

moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Christiansen determined that Welsh was moderately limited in his ability to maintain attention and concentration for extended periods. Dr. Christiansen found that Welsh was not significantly limited in any other areas. In his conclusion, Dr. Christiansen focused on McNeal's and Jacob's consultative examination and report, and found that:

> The diagnoses are not well supported, and the [consultative] report does not support the GAF score [of 50]. Given the information in the report, the impairments do not appear to be severe, but giv[ing Welsh] the benefit of the doubt, it is likely that he does have significant anxiety, which, to some extent, interferes with concentration and memory. No other significant deficits are noted.
>
> The record is limited. The allegations are supported to the extent of the above assessment.

(Administrative Record at 394.)

On April 16, 2007, at the request of DDS, Welsh met with Dr. Danice F. Klimek, M.D., for a consultative examination. Upon examination, Dr. Klimek determined that Welsh was restricted as follows: He can (1) occasionally lift, push, pull, or carry 15-20 pounds from floor to waist, (2) occasionally lift, push, pull, or carry 20 pounds from waist to shoulder, (3) occasionally lift, push, pull, or carry 10-15 pounds over the shoulder, (4) rarely use his right upper extremity due to bilateral shoulder dysfunction with weakness and numbness in his right upper extremity, and (5) rarely grasp or grip with his right upper extremity. Dr. Klimek also determined that Welsh was restricted to the use of hand tools only.

On April 27, 2007, Dr. James D. Wilson, M.D., reviewed Welsh's medical records and provided DDS with a physical RFC assessment for Welsh. Dr. Wilson determined that Welsh could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or

carry 10 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson also determined that Welsh could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Wilson further found that Welsh would be limited in reaching overhead, handling, fingering, and feeling due to his shoulder and hand problems. Dr. Wilson opined that Welsh should avoid concentrated exposure to hazards such as machinery and heights. Dr. Wilson found no visual or communicative limitations.

On October 2, 2007, Dr. Chrystalla Daly, D.O., reviewed Welsh's medical records and provided DDS with a physical RFC assessment for Welsh. Dr. Daly determined that Welsh could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Daly also determined that Welsh could frequently climb ramps and stairs, balance, and stoop, but could only occasionally climb ladders, ropes, and scaffolds, kneel, crouch, and crawl. Dr. Daly further found that Welsh was limited to rare overhead reaching and occasional to rare handling, fingering, and feeling due to right traumatic brachial plexopathy and shoulder dysfunction. Dr. Daly opined that Welsh should avoid concentrated exposure to extreme cold and hazards such as machinery and heights. Dr. Daly found no visual or communicative limitations.

On April 24, 2008, Welsh underwent left rotator cuff surgery for a third time.[11] Following the surgery, on July 31, 2008, Dr. Daniel C. Fabiano, M.D., indicated that Welsh could work with the following permanent restrictions: (1) no lifting, pulling, or

---

[11] Welsh previously underwent left rotator cuff surgeries in 2002 and 2003. He also underwent a right rotator cuff surgery in 2003.

pushing over 5 pounds, and (2) no above the shoulder reaching. Welsh re-tore his left rotator cuff, and underwent a fourth left rotator cuff surgery on October 9, 2008.

On July 31, 2009, Welsh was referred to Dr. Sunny Kim, M.D., for consultation on bilateral shoulder pain. Welsh reported to Dr. Kim that his shoulder pain ranges from 3/10 to 7/10 to 10/10 on a ten-point scale with 10 being the highest amount of pain. Welsh described the pain as "sharp, stabbing, aching, pins and needles."[12] According to Welsh, the pain interferes with his "ability to sleep, eat, dress, bathe, walk, work, socialize, exercise, and climb stairs."[13] Dr. Kim noted that Welsh:

> feels frustrated. He has had multiple surgeries and continues
> to have pain at both shoulders. It limits him functionally and
> impairs his quality of life. He is also a very anxious person to
> begin with, and this certainly does not help the situation.

(Administrative Record at 836.) Upon examination, Dr. Kim diagnosed Welsh with bilateral rotator cuff tears, and noted that Welsh "remains symptomatic and has had recurring rotator cuff tears despite surgical intervention."[14] Dr. Kim also diagnosed Welsh with right upper limb weakness and anxiety disorder. Dr. Kim recommended platelet-rich plasma injections to both shoulders as treatment. Dr. Kim opined that the platelet-rich plasma injections were "truly [Welsh's] last resort in my opinion, and is a medical necessity in order to improve [his] level of pain and quality of life."[15] Welsh underwent a platelet-rich plasma injection in his left shoulder on August 8, 2009. Dr. Kim opined that the injection might reduce Welsh's chronic shoulder pain, but had "no

---

[12] Administrative Record at 836.

[13] *Id.*

[14] *Id.* at 837.

[15] Administrative Record at 837.

prediction as to whether it will improve or worsen his functional status. I do feel that it can improve his quality of life."[16]

On February 16, 2010, Welsh met with Dr. James Nepola, M.D., for evaluation of bilateral shoulder pain, particularly on the left. Welsh reported persistent pain that limited his daily activities. Dr. Nepola noted that Welsh could "only use his arm for 15 to 20 minutes before pain causes him to stop."[17] Dr. Nepola also noted that Welsh had undergone rotator cuff surgery 5 times on his left shoulder, and 3 times on his right shoulder. In reviewing an MRI of Welsh's shoulder, Dr. Nepola found another partial rotator cuff tear in his left shoulder. Dr. Nepola recommended surgery as treatment, but cautioned that "arthritis may be a contributing factor to [Welsh's] pain."[18] On July 2, 2010, Welsh underwent left rotator cuff repair. He was discharged with pain medication on July 3. Welsh returned to Dr. Nepola on July 20, and was found to be "doing well" following surgery. Welsh continued on pain medication and was directed to perform physical therapy.

On September 27, 2010, Dr. Scott Shafer, Ph.D., reviewed Welsh's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Welsh. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Welsh with major depressive disorder, post-traumatic stress disorder, obsessive compulsive tendencies, and alcohol and cocaine abuse in remission. Dr. Shafer determined that Welsh had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment,

---

[16] *Id.* at 839.

[17] *Id.* at 1466.

[18] *Id.* at 1467.

Dr. Christiansen determined that Welsh was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. Dr. Shafer concluded that:

> [Welsh] was able to obtain and perform employment in the past until he was physically unable to do the job. He has had consistent treatment for a mental condition, largely focused on situational stress. He has not always been medication compliant. [Activities of daily living] indicate limitations based on a physical condition, but fewer limitations based on a mental condition. [Welsh] retains the ability to perform routine vocational tasks.

(Administrative Record at 1544.)

On October 11, 2010, Dr. Matthew Byrnes, D.O., reviewed Welsh's medical records and provided DDS with a physical RFC assessment for Welsh. Dr. Byrnes determined that Welsh could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull occasionally with limitations in his upper extremities. Dr. Byrnes also determined that Welsh could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but could never climb ladders, ropes, and scaffolds, or crawl. Dr. Byrnes further found that Welsh was limited to no overhead reaching or lifting, and had minor limitations in handling, fingering, and feeling with his

right upper extremity.[19]  Dr. Byrnes opined that Welsh should avoid concentrated exposure to vibration and hazards such as machinery and heights.  Dr. Daly found no visual or communicative limitations.

On May 23, 2011, Welsh returned to Dr. Nepola for a follow-up appointment. Dr. Nepola found that Welsh was doing "well."  Dr. Nepola noted that Welsh "does not have significant pain in his left shoulder.  He is able to do most of daily activities without any significant difficulties."[20]  Upon examination, Dr. Nepola found that Welsh had 5 out of 5 strength with internal and external rotation.  Dr. Nepola also determined that Welsh was neurovascularly intact in his upper left extremity.  Dr. Nepola opined:

> With regards to permanent work restrictions, we do not recommend repetitive overhead lifting or overhead activities. We also do not recommend any repetitive lifting, with the arm extended away from the body.  This is especially important in light of [Welsh's] ulnar nerve dysfunction on his right side. He, otherwise, will continue his activities as tolerated[.]

(Administrative Record at 1655.)

## V.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that prior to April 27, 2012, Welsh was not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007).  The five steps an ALJ must consider are:

---

[19] Dr. Byrnes found that Welsh had no limitations in handling, fingering, and feeling with his left upper extremity.  *See* Administrative Record at 1563.

[20] Administrative Record at 1653.

21

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden

shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Welsh had not engaged in substantial gainful activity since August 12, 2006. At the second step, the ALJ concluded from the medical evidence that Welsh had the following severe impairments: rotator cuff tears, status post multiple repairs, right knee meniscus tear, status post repair, carpel tunnel disease, right traumatic brachial plexopathy, depression, anxiety, obesity, COPD, and a history of polysubstance abuse. At the third step, the ALJ found that Welsh did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Welsh's RFC as follows:

> [Welsh] has the residual functional capacity to perform sedentary work . . . except: he can only lift five pounds with either upper extremity. Moreover, he cannot climb ladders, ropes, or scaffolds, and may only occasionally climb ramps or stairs. [Welsh] can occasionally balance stoop, kneel, crouch, or crawl. However, he may not reach overhead bilaterally, and while he is left-hand dominant, he may only occasionally finger with his right hand. Moreover, he cannot be required to drive, and he must avoid concentrated exposure to extremes of cold and hazards. Finally, he is limited to simple, routine, repetitive work with only simple, work-related decisions and few workplace changes.

23

(Administrative Record at 856.) Also at the fourth step, the ALJ determined that Welsh was unable to perform any of his past relevant work. At the fifth step, the ALJ determined that prior to April 27, 2012, and based on his age, education, previous work experience, and RFC, Welsh could have worked at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that prior to April 27, 2012, Welsh was not disabled. Also, at the fifth step, the ALJ determined that beginning on April 27, 2012, the date Welsh's age category changed, and considering his age, education, previous work experience, and RFC, there were no jobs in the national economy which Welsh could perform. Thus, Welsh was determined to be disabled, and entitled to SSI benefits beginning on April 27, 2012.

## B. *Objections Raised By Claimant*

Welsh argues that the ALJ erred in three respects. First, Welsh argues that the ALJ's RFC assessment is flawed and not supported by substantial evidence. Second, Welsh argues that the ALJ failed on remand, to adequately resolve the conflicts between the Dictionary of Occupational Titles ("DOT") and the testimony of the vocational expert. Lastly, Welsh argues that the ALJ failed to sustain his burden of proving that there are a significant number of jobs in the national economy that he could perform.

### 1. *RFC Assessment*

Welsh argues that the ALJ's RFC assessment is flawed and not supported by substantial evidence. Specifically, Welsh argues that the ALJ failed to include all of his limitations in the ALJ's RFC assessment. For example, Welsh maintains that the ALJ failed to consider his need for work absences due to his limitations. Welsh also asserts that the ALJ failed to consider his standing, walking, reaching, and pace limitations in determining his RFC. Welsh concludes that this matter should be remanded for further consideration of the effects of his limitations, especially as they pertain to his RFC.

24

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

A thorough review of the ALJ's decision demonstrates that he fully considered and addressed Welsh's functional limitations, including Welsh's abilities with regard to standing,[21] walking,[22] reaching,[23] pace,[24] and absences from work.[25] The ALJ concluded that:

> In sum, while [Welsh's] conditions continued to affect him after the initial hearing, the submitted documentation shows that both before and after that time, he has maintained a level of functionality consistent with the above-listed residual functional capacity assessment. Specifically, his activities of daily living simply contradict his assertions that he cannot tolerate work activity. For example, he claims to be unable to hold items for extended periods or grasp, yet he is able to hunt, which would require the use of either a bow or gun. Additionally, during his work checking identification, he would have to use at least one of his hands to take, inspect, and then return patrons' driver's licenses. When considered with the functional observations of his left upper extremity after his last rotator cuff tear repair, the undersigned finds the above-listed residual functional capacity assessment adequately accounts for Welsh's impairments.

(Administrative Record at 861.)

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Welsh's medical records, observations of treating physicians, and Welsh's own

---

[21] *See* Administrative Record at 860.

[22] *Id.*

[23] *Id.* at 859-60.

[24] *Id.* at 855, 860.

[25] *Id.* at 855.

description of his limitations in making the ALJ's RFC assessment for Welsh.[26] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Welsh's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

### 2. *Vocational Expert Testimony, the DOT, and Significant Jobs in the National Economy*

Welsh argues that the ALJ's ultimate disability determination is flawed because the ALJ improperly relied on vocational expert testimony that was inconsistent with the DOT. At the administrative hearing held on February 22, 2012, the ALJ provided the vocational expert with a hypothetical question for an individual:

> who is capable of performing sedentary work . . . can lift up to five pounds with either of the upper extremity; who cannot climb ropes, ladders or scaffolds; who can occasionally climb ramps and stairs; who can occasionally balance, stoop, kneel, crouch and crawl; who cannot perform lifting or reaching above the shoulders bilaterally. He is left-hand dominate and is limited to occasionally or less handling and fingering with his right hand. There should be no requirement to drive on the job. He must avoid concentrated exposure to cold, vibrations and hazards such as moving machinery and heights. Assume he can perform simple routine repetitive work with simple work-related decisions and few work place changes.

---

[26] *See Id.* at 855-61 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

(Administrative Record at 936.) Based on this hypothetical, the vocational expert testified that Welsh could perform the following jobs: (1) call-out operator, and (2) surveillance system monitor.

Welsh argues that the vocational expert's testimony is flawed because Welsh's RFC, which was provided by the ALJ in his hypothetical to the vocational expert, is inconsistent with the DOT's job descriptions for call-out operator and surveillance system monitor. In other words, Welsh asserts that the ALJ's RFC places restrictions on him which are inconsistent with the DOT job descriptions, and preclude him from being able to perform the jobs of call-out operator and surveillance system monitor. Specifically, Welsh points out that each of these jobs are classified as sedentary work. Under the DOT, sedentary work is defined as the ability to exert up to 10 pounds of force occasionally. *See* DICOT 379.367-010, 1991 WL 673244 (Surveillance System Monitor description requiring "[e]xerting up to 10 pounds of force occasionally[.]"); 1991 WL 672186 (Call-Out Operator description requiring "[e]xerting up to 10 pounds of force occasionally[.]"). Similarly, the DOT description for call-out operator requires occasional handling, fingering, and reaching. *See* DICOT 237.367-014, 1991 WL 672186 (Call-Out Operator). Lastly, Welsh notes that both the call-out operator and surveillance system monitor jobs require level 3 reasoning skills which he claims are not consistent with the ALJ's RFC, limiting Welsh to "only simple work-related decisions with few work place changes."[27] *See Id.* (DOT descriptions for Call-Out Operator and Surveillance System Monitor). Welsh maintains that:

> The ALJ's finding that there was no conflict between the DOT and the [vocational expert] testimony is therefore incorrect. The DOT and the [vocational expert] were inconsistent regarding the lifting limitations, the reaching restrictions, and the reasoning requirements.

_____

[27] Administrative Record at 935.

Welsh's Brief (docket number 10) at 11.

Welsh further argues that in accepting the testimony of the vocational expert, the ALJ erred in relying on such testimony because he failed to adequately resolve the inconsistencies between that testimony and the DOT. Specifically, Welsh questions the validity of the ALJ's attempt to resolve any inconsistencies between the vocational expert's testimony and the DOT. Welsh points out that in his decision, the ALJ determined the vocational expert's testimony was consistent with the DOT.[28] Welsh points out among other findings, the ALJ determined that:

> the vocational expert made clear that her personal experience observing the jobs listed, as well as her professional reliance on a scholarly publication by the Journal of Forensic Vocational Analysis, supports the jobs she listed, at the numbers she cited, and with the restrictions posed in the residual functional capacity assessment.

(Administrative Record at 863.) Welsh questions the ALJ's reasoning because:

> The [vocational expert's] testimony was based on very limited personal observation of the surveillance monitor job, and no observation of the call-out operator job. In addition, [the vocational expert] relied on an article that identified jobs which could be done with one arm, but the jobs studied by the authors of the article did not study either of the two jobs identified by the [vocational expert]. Finally, the [vocational expert's] reliance on a publication which identifies one-armed jobs is misplaced in this case, because Mr. Welsh has restrictions on *both* arms.

Welsh's Brief (docket number 10) at 13.

Lastly, Welsh argues that the ALJ failed to sustain his burden at the fifth step of the five-step sequential test, to show that there were a significant number of jobs in the national economy that Welsh was capable of performing. Specifically, Welsh questions

---

[28] *Id.* at 863.

the validity of the vocational expert's testimony with regard to the number of call-out operator and surveillance system monitor jobs available in Iowa. Welsh believes that some of the 330 such jobs identified by the vocational expert would be part-time jobs and include duties that Welsh was incapable of performing. Welsh concludes that "[i]n light of the questionable validity of the [vocational expert's] testimony, Mr. Welsh's severe medical problems, and his inability to drive distances, the ALJ's finding that there are a 'sufficient' number of jobs he would be capable of performing must be reversed."[29]

Social Security Regulation ("SSR") 00-4p explains that in making disability determinations, the Social Security Administration relies "primarily on the DOT for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 at *2. SSR 00-4p further provides that:

> Occupational evidence provided by a VE [(vocational expert)] . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

*Id.*; *see also Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (An ALJ is "required not only to ask the expert whether there is a conflict, but also to obtain an explanation for any such conflict."); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997) ("When expert

---

[29] Welsh's Brief (docket number 10) at 21.

testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls."). While SSR 00-4p clearly provides that occupation evidence provided by a vocational expert should be consistent with occupational information contained in the DOT, the Court is cautioned not to read too much into this Social Security regulation. In *Wheeler v. Apfel*, 224 F.3d 891 (8th Cir. 2000), the Eighth Circuit explained that:

> 'reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.' The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.

*Id.* at 897 (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Here, the ALJ sought testimony from a vocational expert at the administrative hearings held on February 22, 2012 and May 25, 2012. At the May 25, 2012 hearing, the ALJ specifically asked the vocational expert whether her testimony was consistent with the DOT. The vocational expert replied that her testimony was consistent with the DOT.[30] Furthermore, the ALJ elicited testimony from the vocational expert that the DOT includes all the tasks that may be required in a particular job in broad categories, but are not necessarily required in every position.[31] For example, the vocational expert provided the following testimony in questioning from the ALJ:

> Q:    . . . Now do the jobs you identified, surveillance system monitor and call out operator, do those jobs require lifting up to 10 pounds?

---

[30] Administrative Record at 966.

[31] *See Id.* at 937, 956, 960.

31

A:   No. They do not. I think there are a number of
     sedentary unskilled jobs that do not require lifting up to
     10 pounds.
Q:   Then is that based on what?
A:   Well, my own expertise in observing people at work.
Q:   Well isn't the category of sedentary work and the 10
     pound lifting requirement just a broad category?
A:   Yes.
Q:   Are there jobs that would be classified as sedentary
     even if they do not require lifting up to 10 pounds?
A:   And I think that's true of all the exertional requirements
     according to the Department of Labor. Lifting up to 50
     pounds may not be required in medium job, for
     example.
Q:   Okay. Thank you.
A:   It's simply the outer edges.

(Administrative Record at 937-38.) The Court finds that such explanations from the
vocational expert are consistent with *Wheeler*, where the Eighth Circuit stated "'reliance
on the DOT as a definitive authority on job requirements is misplaced, however, for DOT
definitions are simply generic job descriptions that offer the approximate maximum
requirements for each position, rather than their range. . . .' In other words, not all of the
jobs in every category have requirements identical to or as rigorous as those listed in the
DOT." 224 F.3d at 897 (quoting *Hall*, 109 F.3d at 1259); *see also Hillier v. Social
Security Administration*, 486 F.3d 359, 366-67 (8th Cir. 2007) (same).

Additionally, with regard to the issue of level 3 reasoning, in *Renfrow*, the Eighth
Circuit determined that the inability to do complex work was not inconsistent with the
DOT requirement of level 3 reasoning. 496 F.3d at 921. In making this determination,
the Eighth Circuit in *Renfrow*, relied on *Hillier*, where the court found that a vocational
expert's opinion that a claimant limited to following "simple, concrete instructions" could
work as a cashier was not inconsistent with the DOT description of a cashier requiring
level 3 reasoning. *Id.*; *see also Hillier*, 486 F.3d at 367. Accordingly, the Court finds

that the vocational expert's testimony was not inconsistent with the DOT on the basis of the surveillance system monitor and call-out operation jobs requiring level 3 reasoning.

Having reviewed the entire record, the Court finds that the vocational expert's opinion that Welsh could perform the jobs of call-out operator and surveillance system monitor was based on a proper hypothetical question which incorporated the ALJ's proper RFC determination for Welsh, including the ALJ's restrictions on lifting, reaching, and pace.[32] Furthermore, in answering the hypothetical question posed by the ALJ, the vocational expert properly provided reasonable explanations for any inconsistencies between her testimony and the DOT. Moreover, the ALJ's RFC assessment for Welsh is overall consistent with the DOT in all respects, except for the occasional 10-pound lifting requirement for both the call-out operator and surveillance system monitor jobs, and the occasional handling, fingering, and reaching requirements of the call-out operator job. Accordingly, the Court finds that the ALJ did not err in relying on the vocational expert's testimony. *See Gragg v. Astrue*, 615 F.3d 932. 941 (8th Cir. 2010) ("Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies."); *see also Wagner v. Astrue*, 499 F.3d 842, 854 (8th Cir. 2007) (recognizing that an ALJ may rely on the testimony of a vocational expert when making his or her findings at step four and five of the five-step sequential evaluation). In conclusion, the Court determines that the ALJ properly followed and addressed the requirements of SSR-004p, and properly relied on the vocational expert's testimony in making his disability determination for Welsh.

Finally, the Social Security Regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having

---

[32] *See* the Court's discussion and finding that the ALJ's RFC assessment was proper in section *V.B.1* of this decision.

requirements which [a claimant is] able to meet[.]" 20 C.F.R. § 404.1566(b); *see also* 20 C.F.R. § 416.966(b) (same); *Weiler v. Apfel*, 179 F.3d 1107, 1110 (8th Cir. 1999) (providing that on review a court is not required to compare the claimant's RFC to every job recommended by the vocational expert). While the vocational expert testified that there are only 330 call-out operator and surveillance system monitor positions in Iowa, the Eighth Circuit has found that an occupation with 200 positions is adequate for meeting the requirement at step five of the disability determination, that there are a "significant number" of jobs in the national economy which a claimant can perform. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). Accordingly, the Court finds that the at the ALJ did not err at the fifth step of the five-step sequential test, and properly determined that there were a significant number of jobs in the national economy that Welsh was capable of performing prior to April 27, 2012.

In summary, the Court finds that the ALJ properly followed and addressed the requirements of SSR-004p. The ALJ properly relied on the vocational expert's testimony in making his disability determination for Welsh. Specifically, the ALJ resolved any conflicts between the vocational expert's testimony and the DOT, by eliciting reasonable explanations from the vocational expert for any apparent inconsistencies with the DOT.[33] *See Renfrow*, 496 F.3d at 921. Therefore, the Court determines that the ALJ's disability determination is not flawed, and the ALJ properly relied on the vocational expert testimony in this matter. *See Wagner*, 499 F.3d at 854. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ

---

[33] Because the Court finds that the ALJ properly relied on the vocational expert's testimony in making his disability determination without consideration of the vocational expert's reference to a publication regarding one-arm jobs, the Court concludes that Welsh's argument in that regard is moot and has no merit. The Court will not further address that issue.

because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. The Court also finds that the ALJ did not err in relying on the testimony of the vocational expert to find that there were a significant number of jobs in the national economy that Welsh could perform prior to April 27, 2012. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this _____ day of _____, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA